UNITED STATES DISTRICT COURT
NORTHEN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DONNA MAE REINDL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 09 C 2695 |
| v. | ) |
| | ) Magistrate Judge Sidney I. Schenkier |
| MICHAEL ASTRUE, COMMISSIONER | ) |
| OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

In this social security disability insurance benefit appeal, plaintiff Donna Mae Reindl moves

for summary reversal and/or remand of a final decision by the Commissioner of the Social Security

Administration ("SSA"), pursuant to 42 U.S.C. § 405(g) (doc. # 22). The Commissioner has filed

a cross-motion for summary judgment to affirm the decision rejecting Ms. Reindl's claim for

Disability Insurance Benefits ("DIB") (doc. # 26). For the reasons set forth below, we deny the

Commissioner's motion, we grant plaintiff's motion, and we reverse the final decision and remand

for further proceedings.

**I.**

We begin with a summary of the procedural history of this case. Ms. Reindl applied for DIB

on May 10, 2006, on the grounds that she was disabled when she left her employment on June 30,

2005. Her application was denied on August 2, 2006, and again upon reconsideration on November

2, 2006 (R. 72, 79). Ms. Reindl made a timely request for a hearing, which was granted. The

---

[1]On July 22, 2009, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 10, 13).

hearing took place before Administrative Law Judge ("ALJ") Joel G. Fina on February 14, 2008. At the hearing, the ALJ heard from Ms. Reindl and a vocational expert ("VE"), William Schweihs.

On September 29, 2008, the ALJ issued a written decision denying Ms. Reindl's application for DIB. He held that Ms. Reindl failed to show she was disabled under sections 216(I) and 223(d) of the Social Security Act ("Act") and so was ineligible for DIB (R. 71). On November 4, 2008, Ms. Reindl appealed the ALJ decision to the Appeals Council of the SSA (R. 164). On March 6, 2009, the Appeals Council denied the request for review, making the ALJ's decision the final decision of the Commissioner under 42 U.S.C. § 405(g). *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## II.

We now summarize the administrative record. We set forth the general background and evidence concerning Ms. Reindl's history and medical complaints in Part A, followed by the objective medical evidence in Part B. In Part C, we discuss the testimony at the hearing, and in Part D, we address the ALJ's written opinion.

## A.

Ms. Reindl was born on July 11, 1953. She graduated from high school and received a bachelor's degree in business administration with a minor in mathematics (R. 16). A few years later, she began working at a computer technology firm, where she worked for the next twenty-seven years (*Id.*). She rose to the level of Senior Project Analyst, which Ms. Reindl described as a manager position that was a "desk job" but "very stressful" and "quick-paced." (R. 23, 125). In this position she supervised between ten and twenty-five people (R. 126). When Ms. Reindl applied for DIB, she was 53 years old, married, 5'4", and 120 pounds (R. 15, 112).

2

Ms. Reindl worked at the computer technology firm until she retired on June 30, 2005, in order to spend time assisting her elderly parents (R. 16-18). Upon her retirement, Ms. Reindl accepted a buyout, a severance option offered by her company which included a pension (*Id.*). Ms. Reindl was one of about 10,000 people offered a buyout in October 2004 (R. 16, 41).

When she retired, however, Ms. Reindl was unable to help her parents as she had planned. A few weeks before her planned retirement, on June 9, 2005, Ms. Reindl was bitten several times by a bug while gardening (R. 17, 241, 324). She testified that a few days later, she could not get out of bed in the morning, and she continued to feel progressively worse (R. 17). Over the next few years, Ms. Reindl repeatedly complained of severe joint pain or stiffness in her feet, ankles, wrists, hands, shoulders, and other joints, as well as in her face (*see* R. 200-01, 210, 244, 272-76; 349-50). Ms. Reindl's joints sometimes locked, she had pain on the bottom of her feet, joint pain, and occasional stabbing pain in her hands and shoulders that left her without strength even to lift her arm (R. 325). She also repeatedly complained of chest pain and palpitations, a quickened heart rate, shortness of breath, and inability to sleep (*see* R. 241, 243). In addition, Ms. Reindl occasionally feels numbness and tingling in her feet and limbs (*see* R. 207, 509, 557). She also has trouble sleeping and suffers from fatigue as a result (*see* R. 273-74, 485, 546, 535, 524-25, 517).

**B.**

The objective medical evidence documents many of Ms. Reindl's complaints, which can be grouped into joint pains, chest pains and high blood pressure, bronchial issues, and other concurrent medical problems.

3

**1.**

Ms. Reindl first saw a rheumatologist, Dr. Elena Gogoneata, for her joint pains on October 22, 2005 (R. 200). Ms. Reindl told the doctor that she developed a rash four months earlier from possible bug bites, and soon after, she developed pain in her feet and shoulders (*Id.*). Dr. Gogoneata noted that the "painful episodes" in Ms. Reindl's joints, including in her feet, wrists, shoulders, and jaw, lasted one to three days (*Id.*). Ms. Reindl tested negative for Lyme disease, and Dr. Gogoneata started her on Prednisone, a drug commonly used for arthritis and allergies (R. 200-01). The results of a test measuring inflammation in the blood stream, the erythrocyte sedimentation rate ("ESR") were high, leading Dr. Gogoneata to diagnose Ms. Reindl with polyarthralgia, or pain in multiple joints, and "developing osteoarthritis" (R. 195, 201). Upon further testing, another doctor also reported "mild bony degenerative findings" in Ms. Reindl's feet on October 26, 2005 (R. 193).

On December 9, 2005, Ms. Reindl's treating physician, Dr. Joseph Reda, recorded that Ms. Reindl had pain in her wrists, fingers, and shoulders, but that the pain was generally improving with Methylprednisolone, a substitute for Prednisone (R. 210). Other than the pain, the physical examination was normal (*Id.*). Dr. Reda diagnosed Ms. Reindl with rheumatoid arthritis (R. 210-11).

On January 26, 2006, Ms. Reindl saw rheumatologist Dr. Jeanine Connolly regarding her joint pain (R. 261). Dr. Connolly found that Ms. Reindl had "ongoing inflammatory arthritis," and that although her grip was intact, Ms. Reindl's wrists and hands had "subtle diffuse warmth, [and] some mild soft tissue thickening at the wrist that is nontender" (*Id.*). During this exam, Ms. Reindl's ESR was high (*Id.*). In early March 2006, Dr. Kathleen Ruggero, a specialist in infectious diseases and internal medicine, also diagnosed Ms. Reindl with arthritis (R. 308).

4

Ms. Reindl then visited rheumatologist Dr. Robert Katz on sixteen occasions between February and October 17, 2006, for pain in her feet, hands, shoulders, and face (R. 271-76; *see also* R. 345-54). On February 27, 2006, Dr. Katz noted that Ms. Reindl complained that the pain in her feet was "killing her," and that she was stiff all day (R. 273). In the summer of 2006, Dr. Katz recorded Ms. Reindl's foot pain as a five (out of ten), lower back pain as a seven, and her shoulder pain as a two or three (R. 276). On August 15, 2006, Dr. Katz diagnosed Ms. Reindl with fibromyalgia (joint pain and exhaustion), myalgia (muscle pain), myositis (swelling of muscles), and arthralgias (joint stiffness and pain) (R. 404-14). While the level of pain in her joints varied during this time period, on September 22, 2006, Dr. Katz noted no improvement with the pain in her knees, hands, feet, and ankles (R. 349).

Some of the bloodwork ordered by Dr. Katz showed abnormal results, including high ESR and rheumatoid factor, which was indicative of rheumatoid arthritis (R. 280-92). Ms. Reindl also tested positive for antinuclear antibodies ("ANA"), which are part of the immune system (R. 279), and she had slightly high counts of C-reactive proteins ("CRP"), which are created by the liver when the body senses inflammation (R. 278). Ms. Reindl had normal blood counts, liver and kidney chemistries, glucose, electrolytes, and cholesterol, and on at least one date, her test results showed normal levels of ANA and ESR (R. 277-78).

In May 2006, Dr. Katz examined Ms. Reindl's bone density and found some abnormal curvatures in her spine (R. 297). He found that her bone density was normal but noted some narrowing of C5-6 vertebrae (R. 296). He recorded that Ms. Reindl exercised three to five times per week and that she had painful bunions on both of her feet (R. 296-97).

5

Ms. Reindl began seeing a physical therapist, Jennifer Fernandez, beginning on August 25, 2006, per Dr. Katz's orders (R. 327). Ms. Fernandez reported that Ms. Reindl had decreased grip strength, limited ability to sit for longer than ten to fifteen minutes, and only minimal ability to stand, walk, or climb stairs (R. 325). After attending six physical therapy sessions (and missing three) from August 25, 2006, to September 14, 2006, the therapist noted that while Ms. Reindl's strength, walking, trunk rotations, and arm-swinging improved, she still had extreme fatigue, limited strength in her hands, and problems with her fingers locking (R. 323-25). Ms. Reindl also continued to struggle with prolonged sitting, going from a sitting to a standing position, and climbing stairs (R. 330).

On March 30, 2007, Dr. Reda diagnosed Ms. Reindl with rheumatoid arthritis, carpal tunnel syndrome, and causalgia (intense burning pain and sensitivity) of her lower limbs (R. 555). On April 27, 2007, Ms. Reindl complained to Dr. Reda about leg pain, throat pain, and chest pain; he diagnosed her with sacroiliitis, a disease affecting her pelvic joints (R. 545-47). After an X-ray, the doctor found mild degenerative changes in her joints with some mild narrowing (R. 580). Dr. Reda also recorded Ms. Reindl's joint pain on January 29, 2008 (R. 509).

Ms. Reindl has also sought medical treatment for reactions to her arthritis medications. In February 2006, Dr. Katz prescribed Humira for her rheumatoid arthritis (R. 278). After taking Humira, however, Ms. Reindl complained of paresthesias, a condition that creates a feeling of numbness in her limbs, or "falling asleep," in her legs and arms, so she stopped taking Humira (R. 207, 275). On May 26, 2006, Dr. Kerry DiSanto noted that the numbness in Ms. Reindl's limbs seemed to improve as her medications were adjusted (R. 207). On March 14, 2007, however, Ms. Reindl again complained of paresthesias (R. 558-59), and as recently as January 29, 2008, at a

6

check-up to review her medications, Ms. Reindl again told her doctor that her feet were numb and tingling (R. 509). Ms. Reindl was prescribed Arava and Cyclobenzaprine, a muscle relaxant, in 2006 and 2007 (*see, e.g.*, R. 267, 326, 408, 545-63).

**2.**

Ms. Reindl has also had recurring chest pains, shortness of breath, and problems with high blood pressure. On August 21, 2005, Ms. Reindl was admitted to an emergency room complaining of shortness of breath and chest pain, which had continued on and off for a week, even while at rest (R. 241). During these episodes, her heart rate increased above ninety beats per minute, and she had moderate pain lasting for up to fifteen minutes at a time (R. 241, 244). An echocardiogram showed that Ms. Reindl had ischemia (restricted blood supply to a part of the body) (R. 244).

On May 24, 2006, Ms. Reindl complained of chest pain, and an X-ray revealed that, although her heart was normal in size, she had "mild to moderate mitral valvular insufficiency" (a disorder of the heart valve) (R. 304). On August 16, 2006, Dr. Reda noted that Ms. Reindl had a high sitting pulse, high blood pressure, and an audible heart murmur (R. 407). On September 6, 2006, Ms. Reindl visited a cardiology and electrophysiology practice, and she reported that her heart was racing "almost daily" and had been for two weeks straight (R. 480). On September 8, 2006, Ms. Reindl received a forty-eight hour Holter monitor test to track her heart activity (R. 320). After this evaluation, Dr. John Burke reported normal rhythms, average heart rate, and normal conduction (*Id.*). However, he found rare atrial and ventricular ectopy, a disturbance in her heart rhythm, and he diagnosed mild sinus tachycardia, an elevated heart beat originating from the sinus node (*Id.*). On September 22, 2006, Dr. Thomas Bump (another doctor at the cardiology and electrophysiology practice) concurred that Ms. Reindl had palpitations with mild sinus tachycardia after reviewing the

7

results from the Holter test (R. 477). On November 6, 2006, Ms. Reindl was diagnosed with right sided Costochondritis, or inflammation of the rib or connecting cartilage (R. 563-65). On February 14, 2007, Dr. Bump again reported that Ms. Reindl had a very high sitting heart rate along with high blood pressure (R. 476).

On October 15, 2007, further heart tests revealed "mild mitral regurgitation" (a disorder of the heart valve) (R. 586). On October 21, 2007, Ms. Reindl's heart and pulmonary vessels and her lung capacity were within normal limits (R. 573). The next day, Ms. Reindl had a stress test, which revealed that she had moderate hypokinesis of the distal and apical walls (impaired movement of her heart walls) (R. 585). On October 23, 2007,[2] Ms. Reindl received a cardiac catheterization and coronary/femoral angiography surgery (R. 483, 496). Dr. Roy Bliley reported that the results of the catheterization were within normal limits (R. 496).

On November 5, 2007, Dr. Reda determined that Ms. Reindl had a nonrheumatic mitral valve disorder, another heart valve abnormality (R. 522-24). She went to the emergency room on November 12, 2007, because of chest pain and palpitations (R. 484-85). The emergency room doctor, Dr. Brian Crowley, ordered another Holter monitoring period (R. 485). The Holter monitor test results indicated rare atrial and ventricular ectopy, but the report stated that most of the symptoms reported by Ms. Reindl did not correlate with the recorded high heart rates (R. 493). Ms. Reindl's laboratory reports and X-ray results were within normal limits, and Dr. Crowley heard no heart murmurs (R. 485). Dr. Crowley also recorded her complaints of general fatigue and mild

---

[2]Although the date on the surgery report is November 23, 2007 (R. 483), Dr. Crowley discusses the surgery prior to that date (R. 485), and the surgeon's report is dated October 23, 2007.

8

headaches (*Id.*). Dr. Bump noted that Ms. Reindl had heart palpitations and high blood pressure as recently as January 22, 2008 (R. 466).

Ms. Reindl has had problems with her high blood pressure medications. She visited the emergency room for her high heart rate on December 29, 2007, where she was diagnosed with tachycardia, due to problems with her medications for high blood pressure, Zebeta and Coreg (R. 481). Coreg and the blood pressure medication Norvasc also worsened Ms. Reindl's asthma (*Id.*). She has taken Ecotrin Low Strength for her blood pressure since August 2006 (R. 408). On December 17, 2007, Dr. Reda changed her medications to Amitriptyline and Carvedilol (R. 515).

3.

Ms. Reindl also had a recurring cough and upper respiratory illness in 2006 and 2007. On May 23, 2006, Ms. Reindl had an MRI of her head, which revealed a retention cyst in her sinuses (R. 295), and on May 26, 2006, she complained of a painful pressure in her head (R. 207). On August 12, 2006, Ms. Reindl saw Dr. Reda for a serious cough (R. 406). On October 21, 2006, Ms. Reindl complained of a sore throat; and Dr. Heather Marino diagnosed her with pharyngitis (R. 409). Further, on November 6, 2006, Ms. Reindl was diagnosed with chronic sinusitis (R. 563-65), and on December 13, 2006, she was diagnosed with an upper respiratory infection (R. 560-62).

On April 7, 2007, Ms. Reindl was again diagnosed with an upper respiratory infection and pharyngitis (R. 551), and on April 21, 2007, she was diagnosed with bronchitis (R. 548-49). On September 4 and 24, 2007, she sought treatment for a bad cough, fatigue, and sinus congestion, and she was diagnosed with bronchitis and sinusitis (R. 529, 533). On October 6, 2007, she was again diagnosed with pharyngitis (R. 527). On November 5, 2007, Ms. Reindl again complained of a persistent cough (R. 522). She was prescribed Amoxicillin and Augmentin for her various cough

9

and respiratory problems (R. 567, 531, 528). Ms. Reindl also took Claritin for her allergies and Flovent for asthma beginning in January 2006 (R. 261).

### 4.

In 2007, Ms. Reindl had a series of other ailments. On May 25, 2007, Ms. Reindl was diagnosed with a dermoid and ovarian cyst (R. 578-79). In June 2007, Dr. Reda found an enlargement of Ms. Reindl's thyroids, and he referred her to a specialist who found multiple nodules in her thyroids (R. 538-42, 577). On November 30, 2007, Ms. Reindl underwent a Polysomnogram sleep study to examine the reasons for her recurring fatigue (R. 628). The results indicated "grossly abnormal sleep architecture" and some snoring abnormalities and sleep apnea, although not clinically abnormal (R. 629-37). Ms. Reindl was also depressed after her parents died in February 2007, and she was prescribed the antidepressants Trazodone and Elavil (R. 557-58, 563).

### 5.

Three RFC assessments were performed in this case. On July 31, 2006, Dr. Virgilio Pilapil, a medical consultant for SSA, reviewed Ms. Reindl's medical records to opine on her residual functional capacity ("RFC") (R. 310-317). He recorded her impairments as arthritis, asthma, and fibromyalgia (R. 310). Dr. Pilapil's completed form indicated that he thought she could (1) occasionally lift or carry fifty pounds, (2) frequently lift or carry twenty-five pounds, (3) stand and/or walk about six hours in an eight hour day, (4) sit about six hours in an eight hour day, and (5) push and/or pull anything (R. 311). He found no postural, manipulative,[3] visual, or communicative limitations (R. 312-13). Because of her asthma, he found that Ms. Reindl must avoid exposure to

---

[3]Manipulative limitations include reaching in all directions (including overhead), handling (gross manipulation), fingering (fine manipulation), and feeling (skin receptors) (R. 313).

10

fumes, odors, dusts, gases, and poor ventilation (R. 314). Dr. Pilapil noted that Ms. Reindl has a history of asthma and joint soreness and stiffness in her shoulders, knees, ankles, feet, and lower back, and imaging revealed an abnormal curvature of her back and neck and narrowing of the C5-C6 discs (R. 317)

Three months later, on October 25, 2006, Dr. Ernst Bone, another medical consultant for SSA, also reviewed Ms. Reindl's medical records to opine on her RFC (R. 396-403). He recorded her impairments as possible rheumatoid arthritis, fibromyalgia, and asthma (R. 396). Dr. Bone opined that Ms. Reindl could (1) occasionally lift or carry twenty pounds, (2) frequently lift or carry less than ten pounds, (3) stand and/or walk at least two hours in an eight hour day, (4) sit about six hours in an eight hour day, and (5) not push and/or pull anything repeatedly or rapidly with either her upper or lower extremities (R. 397). He further found that she could climb ramps or stairs occasionally, but never ladders, ropes, or scaffolds, and that she could only kneel or crawl occasionally because it "would require extensive use of arms and legs and feet, all of which she bitterly complains are causing her a lot of joint pain" (R. 398). Dr. Bone found no manipulative, visual, or communicative limitations (R. 399-400), but he found environmental restrictions because of her asthma and arthritic problems (R. 400). Dr. Bone opined that the severity of Ms. Reindl's symptoms and their effect on function were consistent with the evidence (R. 401). He further noted that Ms. Reindl experiences heart palpitations and some rhythm irregularities, and that she appeared to have fibromyalgia or possibly rheumatoid arthritis, as she experienced pain, stiffness, and some limitation in range of motion in all of her major joints (R. 403). Further, although her bone density studies were within normal limits, Dr. Bone also noted some curvature in her neck and back (*Id.*).

Most recently, on February 22, 2008, Dr. Katz, Ms. Reindl's treating rheumatologist, completed an RFC assessment (R. 504-506). He found that Ms. Reindl could occasionally lift or carry less than ten pounds, frequently lift or carry nothing, and stand and/or walk less than two hours in an eight hour day with a cane and frequent rest periods (R. 504). Dr. Katz did not state how many hours Ms. Reindl could sit in a work day, but noted that she needs to get up intermittently to relieve pain (R. 505). Dr. Katz described her pushing and/or pulling as limited by pain and stiffness (*Id.*). He found that Ms. Reindl could occasionally climb ramps or stairs, but never ladders, ropes, scaffolds, and never balancing, kneeling, crouching, or crawling (*Id.*). Dr. Katz stated that Ms. Reindl's handling (gross manipulation) was unlimited, but that her fingering (fine manipulation), reaching (overhead and in all directions), and feeling (skin receptors) were all limited in duration (R. 506). Dr. Katz added that Ms. Reindl has polyarthritis and fibromyalgia, and that her sensitivity to medications made it difficult to manage her ailments (R. 505).

## C.

At the hearing on February 14, 2008, Ms. Reindl testified that she sometimes sweeps, does dishes, cooks, and showers by herself, but she cannot take care of herself all of the time (R. 18-20). She reported that she could only lift a couple of pounds (R. 24), can only sometimes bend to reach the floor (R. 21), and uses a cane "most of the time" unless she is at "a public place and a wheelchair [is] available" (R. 24). She has a valid driver's license with a disabled parking permit (R. 19).

Ms. Reindl described having episodes of increased heart rate which last several hours, four or five times a week (R. 34-35). She stated that these episodes normally occur in the morning and that during these episodes she has difficulty breathing and cannot raise her arms or walk (R. 35).

12

Ms. Reindl also stated that she has difficulty using a computer mouse and keyboard because her fingers lock, she has arthritis in her fingers, and she has carpal tunnel syndrome from repeated motions (R. 20). She also testified that she has trouble sitting, standing, or walking for long periods of time (R. 21). She estimated that her use of computers was limited to "five minutes or so" at a time, with a thirty minute break in between uses (R. 36). She said that it would be "extremely difficult" for her to use a keyboard for a full work-day, because of her fatigue from pain and the repetitive motions (R. 37). She stated that her fine finger manipulations were so minimal that she was unable to open a twist-top bottle or pick up coins from a table without sliding the coins off the side (R. 26, 37-38).

The VE testified next (R. 44). He characterized Ms. Reindl's prior work as "skilled work" performed at the "sedentary level of physical exertion." (R. 46). The ALJ sought the VE's opinion on several hypothetical individuals. In the first hypothetical, the ALJ described a person of Ms. Reindl's background, who could lift up to ten pounds occasionally, frequently handle objects (gross manipulation), frequently finger (fine manipulation of smaller items), occasionally push or pull, never climb ladders, ropes, or scaffolds, occasionally climb ramps or stairs, occasionally balance, stoop and crouch, and never kneel or crawl, in an environment free from irritants (R. 46-47). The VE opined that such a person could perform Ms. Reindl's past work (R. 47).

For the second hypothetical, the ALJ added to the above restrictions that the person be allowed to "sit or stand alternatively at will" without being taken off task more than ten percent of the time (R. 47). The VE opined that such a person could also do Ms. Reindl's prior work, provided that she stay on task ninety percent of the time (R. 48). Next, the ALJ limited the hypothetical individual to occasional overhead reaching and to the use of a cane over uneven terrain or during

13

prolonged walking (Id.). The VE again stated that the prior work would be feasible (R. 49). However, the VE opined that the limitations on mobility would limit the transferability of the individual's skills if other jobs required more frequent moving and carrying (R. 50). Lastly, the ALJ asked the VE to assume that the person would be unable to sustain a regular forty-hour work week because of pain. The VE stated such a person would be precluded from work at all exertion levels (R. 49). The VE added that in the skilled labor force, the pressure to complete projects requires that a person not miss even one day a month on a regular basis (Id.).

Ms. Reindl's attorney then posed two more hypothetical individuals to the VE. The attorney asked the VE to consider an individual of the claimant's age, work experience, and education who could occasionally lift twenty pounds, frequently lift ten pounds, stand and walk at least two hours, and sit with normal breaks for six hours, but could not perform "repeated and rampant pushing, pulling, lifting, or carrying motions with her upper or lower extremities" (R. 51). The VE stated that this would not preclude the claimant's past relevant work, consisting mainly of keyboard work, because the VE did not consider using a mouse or keyboard to be pushing and pulling (R. 51-52). However, the VE opined that a person who was limited to occasionally fingering and grasping would be precluded from the claimant's past relevant work (R. 54).[4] The VE also opined that such limitations would prohibit the claimant's skills from transferring to other work (R. 54). Ms. Reindl's attorney then asked about a person who misses work frequently due to unexpected tachycardia (R. 54-55). The VE opined that if the person were taken off task six hours a week, or fifteen percent of

---

[4]We note that portions of the VE's testimony on cross examination are unclear because Ms. Reindl's attorney and the VE frequently interrupted each other. In particular, it is unclear whether the VE testified that a limitation to frequently (as opposed to occasionally) fingering and grasping would also preclude Ms. Reindl's prior employment (see R. 51-54).

14

the time, that person would be unable to perform the claimant's past relevant work or any other work (R. 55).

**D.**

In his September 29, 2008, written opinion, the ALJ applied the Act's sequential five-step analysis and found Ms. Reindl not disabled (R. 66, 70). The ALJ found that Step 1 was met because Ms. Reindl had not been engaged in substantial gainful activity since June 30, 2005, the date of her application for DIB (R. 66). In Step 2, the ALJ found that Ms. Reindl had the following severe impairments: fibromyalgia, hypertension, rheumatoid arthritis, polyarthralgia, carpal tunnel syndrome, sinus tachycardia, asthma, mitral valve insufficiency, and ischemia (*Id.*).

The ALJ then listed several of Ms. Reindl's doctor's visits from August 2005 through December 2007, and her medical complaints and the results of medical examinations at those visits (R. 66-68). These complaints included shortness of breath, chest pain, high blood pressure, sinus tachycardia, bronchitis, and intermittent paresthesias (*Id.*). The ALJ also noted that Ms. Reindl visited rheumatologists for her foot, wrist, finger, shoulder, and other joint pain and stiffness, who diagnosed her with polyarthralgia, arthritis, carpal tunnel syndrome, and causalgia of the lower limbs (*Id.*). The ALJ further listed some of Ms. Reindl's visits to cardiologists regarding her chest pain and palpitations which resulted in normal chest X-rays but a diagnosis of tachycardia and elevated blood pressure (R. 68). The ALJ also reviewed Ms. Reindl's complications with medicines, and her reports of numbness and tingling in her hand, foot, and face (R. 67). He noted the diagnoses of ovarian cysts, spinal narrowing, mild to moderate heart valve malfunctioning, and bunions (*Id.*). The ALJ discussed Ms. Reindl's physical therapy, and noted that her leg strength, flexibility, and mobility improved (R. 68).

15

The ALJ then concluded at Step 3 that Ms. Reindl does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments (R. 68). The ALJ did not state which specific listings he considered (*Id.*).

Next, the ALJ determined that Ms. Reindl's RFC allowed her to

lift up to ten pounds occasionally in sedentary work as defined in 20 CFR § 404.1567(a), allowing claimant the option to sit or stand alternatively at will provided that the claimant is not taken off task more than 10% of the work period. Claimant can never climb ladders, ropes or scaffolds, kneel or crawl. Claimant can occasionally climb ramps or stairs, balance, stoop, and crouch. Claimant can occasionally reach overhead. Claimant can frequently handle objects (gross manipulation) and frequently finger (fine manipulations).

(R. 69). Further, he found Ms. Reindl's RFC contained environmental limitations, requiring her to avoid extreme cold, fumes, odors, dusts and gases. He also acknowledged Ms. Reindl's need for a cane, but only when traversing uneven terrain or during prolonged walking (*Id.*).

In determining Ms. Reindl's RFC, the ALJ stated that Ms. Reindl's statements "concerning the intensity, persistence, and limiting effects" from the symptoms of her medically determinable impairments "[we]re not credible to the extent they [we]re inconsistent with [the ALJ's] residual functional capacity assessment. . ." (R. 69). The ALJ provided the following reasons for this adverse credibility finding. *First*, he stated without discussion that the objective medical evidence he listed is "fulling consistent" with the RFC he set forth (*Id.*). *Second*, the ALJ noted that Ms. Reindl stopped work for non-disability reasons (R. 69-70). *Third*, he stated that Ms. Reindl did not persistently report chronic pain (R. 70). *Fourth*, the ALJ explained that the medical record contained no discussion of Ms. Reindl's inability to meet daily tasks, such as sweeping, showering, or other personal needs, but rather, demonstrated that Ms. Reindl could drive, occasionally wash dishes and cook, load the dishwasher, change her socks, and walk without a cane inside her home (*Id.*).

16

The ALJ then discounted the three RFC reports in the record. *First*, he stated that "the opinions of the state agency medical consultants [Doctors Bone and Pilapil] are entitled to little weight because they did not have the benefit of medical evidence submitted subsequent to those decisions [in 2006]" (R. 70). Next, he found that the February 22, 2008, RFC determination by Ms. Reindl's treating rheumatologist, Dr. Katz, was inconsistent with the medical record and testimony and failed to provide the time period reflected by the opinion (*Id.*). As a result, the ALJ gave "little weight" to Dr. Katz's opinion to "the extent that the opinion is inconsistent with the stated residual functional capacity" (*Id.*).

Based on the stated RFC, and the VE's testimony as to a hypothetical person with that RFC, the ALJ determined that Ms. Reindl could perform her past relevant work as a project analyst (R. 70). The VE had found that a person with Ms. Reindl's RFC (as determined by the ALJ) could perform the sedentary, skilled labor of a computer project analyst job (*Id.*). Thus, the ALJ concluded that Ms. Reindl was not disabled under the Act (R. 70-71). As a result, the ALJ made no findings at Step 5 with respect to Ms. Reindl's ability to perform other work.

## III.

We begin our review of the Commissioner's determination with the governing legal standards. To establish a disability under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Substantial gainful activity includes what a claimant did before the impairment and any other kind of substantial gainful work existing in significant numbers in the national economy. *Id.* § 423(d)(2)(A).

17

The social security regulations outline a five-step evaluation process for determining whether a claimant has a disability. 20 C.F.R. § 404.1520(a)(4). These steps, which must be evaluated sequentially, require the ALJ to determine: (1) whether the claimant is currently performing any "substantial gainful activity;" (2) whether the claimant's alleged impairment or combination of impairments is severe; (3) whether the claimant's impairment(s) meet(s) or equal(s) any impairment listed in the appendix to the regulations as severe enough to preclude substantial gainful activity; (4) whether the claimant is unable to perform his or her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4). A finding of disability requires an affirmative answer at either Step 3 or Step 5. 20 C.F.R. § 404.1520(a)(4). A negative finding at any step other than Step 3 precludes a finding of disability. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). The burden of proof is on the claimant except for Step 5, where the Commissioner must prove that significant numbers of jobs are available in the national economy for an employee of the claimant's ability. 20 C.F.R. § 404.1520(g)(1).

On appeal, the court may not decide facts anew, reweigh evidence, or substitute its own judgment for that of the ALJ. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). While judicial review of ALJ decisions "is deferential, it is not abject." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). We uphold an ALJ's decision if it is supported by substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal citations and quotations omitted). Although the ALJ is not required to address every piece of evidence or testimony presented, the Court "cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of

18

contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker*, 597 F.3d at 921 (internal citations omitted).

## IV.

Ms. Reindl raises several challenges to the ALJ's determination that she is not disabled, including that the ALJ improperly made his own medical findings, failed to give controlling weight to her treating rheumatologist, erred in concluding that Ms. Reindl did not complain regularly of chronic pain and tachycardia, wrongly rejected her credibility, and failed to consider all of the VE's testimony.

## A.

We begin with the ALJ's discussion of the evidence from Dr. Katz, Ms. Reindl's treating rheumatologist. Dr. Katz had found that Ms. Reindl was limited to occasionally lifting or carrying less than ten pounds and to standing or walking less than two hours in an eight-hour workday (R. 504). He opined that Ms. Reindl could not sit for a full six hours because she needs to get up intermittently to relieve her pain (R. 505). In addition, Dr. Katz stated that Ms. Reindl's pushing and pulling were limited in her upper and lower extremities, and that her ability to tolerate feeling, reaching, and fine manipulation, or fingering, was limited (R. 505-06). The ALJ stated, without discussion, that Dr. Katz's opinion was "inconsistent with the medical record, inconsistent with the testimony, and fails to provide the time period reflected by the opinion," and gave "little weight" to any portion of Dr. Katz's opinion that disagreed with the RFC determined by the ALJ (R. 70).

"[A]n ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) it is not inconsistent with substantial evidence in the record. If the opinion is

unsupported or inconsistent with the record, the ALJ may still choose to accept it, but if the ALJ rejects the opinion, he must give a good reason." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)) (internal quotations omitted). If the "ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

Here, as in *Moss*, "the ALJ altogether failed to address" any of the reasons he rejected Dr. Katz's opinion. *Moss*, 555 F.3d at 561. The ALJ did not provide any support for his statement that Dr. Katz's opinion was inconsistent with the record and testimony. Further, the ALJ's refusal to consider Dr. Katz's opinion to the extent it was inconsistent with the RFC the ALJ adopted puts the cart before the horse. The ALJ is not at liberty to first create an RFC and then disregard the evidence that may contradict it. Rather, the ALJ must determine the RFC based on a consideration of all relevant evidence presented in the record. By failing to do this, the ALJ here failed to build a logical bridge between the facts of the case and the outcome. *See Parker*, 597 F.3d at 921.[5]

Furthermore, the ALJ found that the opinions of the state agency medical consultants were entitled to little weight (R. 70), and he did not point to any other evidence in the record to support his RFC determination. This raises the question of from where the ALJ's RFC determination came, and suggests that the ALJ improperly attempted to "play doctor" to reach his own independent

---

[5]The ALJ also stated that Dr. Katz's RFC opinion failed to specify for which dates the opinion applied (R. 70). The RFC form, however, does not require such information, and the Court presumes that the RFC determination applies to the dates for which the medical evidence was reviewed (R. 506).

medical conclusions. *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009). "An ALJ's conjecture is never a permitted basis for ignoring a treating physician's views." *Moss*, 555 F.3d at 560.

In this case, the ALJ's disregard of Dr. Katz's opinions was central to his finding of no disability. In all the ALJ's hypothetical questions to the VE, the ALJ had the VE assume that the individual could frequently perform fine finger manipulation – despite Dr. Katz's opinion that Ms. Reindl would be somehow limited in this area.[6] This was error: the ALJ's hypothetical questions must include all medical limitations supported by the record. *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004). Although Ms. Reindl's attorney added this limitation on cross examination of the VE, the ALJ ignored the VE's testimony on cross examination that Ms. Reindl would not be able to perform her past relevant work if she was limited to occasionally using a keyboard and mouse (R. 54). These errors necessitate reversal and remand.

## B.

In addition, the ALJ erred in finding that Ms. Reindl did not regularly complain of chronic pain and tachycardia and in finding her complaints of her symptoms and not credible (Pl.'s Mem. at 8-9). "We review an ALJ's credibility determination deferentially and uphold it unless it is patently wrong." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). In making this determination, "[w]e look to whether the ALJ's reasons for discrediting testimony are unreasonable or unsupported." *Schaaf*, 602 F.3d at 875.

---

[6]In filling out the RFC form, Dr. Katz said Ms. Reindl would have limitations in fine manipulation, but he failed to check the box indicating the extent of the limitations (R. 506). The ALJ did not cite that omission as a basis for giving little or no weight to Dr. Katz's opinions and, indeed, did not reference it at all. On remand, the ALJ should obtain clarification from Dr. Katz as to the extent of Ms. Reindl's limitation in fine manipulation.

The ALJ set forth three reasons for discrediting Ms. Reindl's testimony: she left work for reasons other than her disability; her complaints of pain are inconsistent with the RFC, and she did not persistently report chronic pain. We address each reason in turn.

*First*, Ms. Reindl's reason for deciding to leave work as of June 30, 2005 – to care for her ailing parents – does not answer the question of whether Ms. Reindl was disabled as of June 30, 2005. According to the record, Ms. Reindl's medical complaints coincided with the date she planned to leave work, despite her original intent to leave work for other reasons.

*Second*, as explained above, the ALJ's decision to dismiss evidence and testimony because it is inconsistent with the RFC the ALJ himself constructed is circular and does not support finding Ms. Reindl's testimony not credible.

*Third*, contrary to the ALJ's opinion, the record is filled with Ms. Reindl's complaints of serious joint pain, chest pain, and tachycardia (*see, e.g.*, R. 200, 207, 210, 244, 269, 271-77, 350, 485). The ALJ stated that Ms. Reindl's testimony as to her pain was not credible because the record does not show that her pain or tachycardia prevented her from lifting a gallon of milk or interfered with her ability to shower or take care of her personal needs, and Ms. Reindl was still able to drive, wash dishes, load the dishwasher, and cook (R. 70). The Seventh Circuit has held, however, that a claimant's minimal daily activities is not substantial evidence that she does not suffer disabling pain. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Further, an ALJ may not disregard a claimant's testimony as to limitations placed on her daily activities where the record is replete with

instances of the claimant seeking medical treatment for her pain, despite the record not detailing limitations on her daily activities. *Id.* Thus, remand on these grounds is also warranted.[7]

## CONCLUSION

For the foregoing reasons, the Court directs the Clerk of the Court to enter judgment granting Ms. Reindl's motion for summary judgment (doc. # 22) and denying the defendant's motion for summary judgment (doc. # 26). Despite the errors in the ALJ's order, we deny Ms. Reindl's request for an outright reversal of the ALJ's decision and an award of benefits without remanding for a rehearing, because the record does not required a finding that Ms. Reindl is disabled under the Act. *See Boiles v. Barnhart*, 395 F.3d 421, 427 (7th Cir. 2005) (despite shortcomings in ALJ's order, the Court declined to award benefits outright because the ALJ did not yet make findings necessary for

---

[7]Ms. Reindl also contends that post-hearing evidence – laboratory results from June 2009 showing numbness in her hands and a diagnosis of bilateral carpal tunnel syndrome – is new and material evidence warranting a remand under 42 U.S.C. § 405(g) (Pl.'s Mem. at 10; doc. # 14: 6/18/09 lab report). In light of our decision to remand on other grounds, we need not address this argument. That said, the evidence is relevant to whether Ms. Reindl has a continuing disability, and it should be considered on remand. Ms. Reindl also seeks to introduce a disabled parking permit as "new and material evidence," but Ms. Reindl does not demonstrate the relevance of this document (Pl.'s Mot., Ex. A).

disability determination). We thus reverse and remand pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this Memorandum Opinion and Order. Terminating case.[8]

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: July 22, 2010

---

[8]On remand, the ALJ should consider appointing an independent medical expert to help resolve the errors in his previous opinion. In addition, the ALJ should consider the additional evidence submitted by Ms. Reindl since the previous hearing. Furthermore, the ALJ should take the opportunity on remand to clarify the VE's opinion as to whether a limitation to frequent fine finger manipulation would also preclude Ms. Reindl's prior work.

In addition, the Court notes an issue not raised by the parties: the ALJ's failure to mention the specific listings he considered in Step 3, when he determined that Ms. Reindl's severe impairments did not meet or medically equal a listed impairment. The Seventh Circuit has held that "an ALJ should mention the specific listings he is considering and his failure to do so, if combined with a 'perfunctory analysis,' may require a remand" to conduct a more thorough Step 3 analysis. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). On remand, the ALJ will have the opportunity to address this point.